UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

IMAGETEC, L.P., an Illinois limited )
partnership, )
 )
      Plaintiff, )
 )
v. )
 )
LEXMARK INTERNATIONAL, INC., a )
Delaware Corporation, and CASSANDRA )
HOSKINS, a Kentucky citizen, )

      Defendants.

Civil Action No. 5:18-CV-011-CHB

**MEMORANDUM OPINION AND
ORDER**

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Defendants Lexmark International, Inc.'s ("Lexmark")

and Cassandra Hoskins' ("Hoskins," collectively with Lexmark, "Defendants") Motion to

Compel Arbitration and to Dismiss Plaintiff's Complaint. [R. 46] Plaintiff Imagetec, L.P.

("Imagetec" or "Plaintiff") responded in opposition. [R. 47] Defendants replied. [R. 48] This

matter is now ripe for decision. For the reasons set forth below, Defendants' Motion to Compel

Arbitration is **GRANTED in part and DENIED in part**. Plaintiff must prosecute its claims

under Counts IV and V consistent with the terms of the Parties' arbitration agreement.

Defendants' Motion to Dismiss is **GRANTED as to these same claims**. This matter, and

prosecution of the remaining claims, will be stayed pending arbitration of the other counts.

## I.    Arbitration Standard of Review

Defendants move to compel arbitration and also move to dismiss Imagetec's claims under

Federal Rule of Civil Procedure 12. [R. 46] Because Defendants move to compel arbitration

pursuant to 9 U.S.C. § 4 of the Federal Arbitration Act (the "FAA"), the Court's standard of

review is different than under a motion brought under Rule 12. When the Court is asked to

compel arbitration under § 4 of the FAA, the Court first "must determine whether the parties have agreed to arbitrate the dispute at issue." *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000). If the Court is satisfied that the agreement to arbitrate is not "in issue," it must compel arbitration. *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002). "In order to show that the validity of the agreement is 'in issue,' the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate," a showing that mirrors the summary judgment standard. *Id.*

Therefore, district courts in Kentucky evaluate a motion to compel arbitration as one for summary judgment under Rule 56(c). *See Freeman v. Easy Mobile Labs, Inc.*, No. 1:16-CV-00018-GNS, 2016 WL 4479545, at *1 (W.D. Ky. Aug. 24, 2016) (citing *Arnold v. Rent-a-Center, Inc.*, No. 11-18-JBC, 2011 WL 1810145, at *2 (E.D. Ky. May 12, 2011) ("This court will treat the motion to compel arbitration as one for summary judgment . . . .")); *Weddle Enters., Inc. v. Treviicos-Soletanche, J.V.*, No. 1:14CV-00061-JHM, 2014 WL 5242904, at *2 (W.D. Ky. Oct. 15, 2014) ("A motion to dismiss based on the existence of a valid arbitration agreement is not evaluated under the usual Fed. R. Civ. P. 12(b)(6) standard. Instead, courts apply the standard applicable to motions for summary judgment.") (internal citation omitted) (citation omitted).

Accordingly, the Court must draw all reasonable inferences in favor of Imagetec and must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). The Court disregards all evidence favorable to the moving party that the jury would not be required to believe. *Id.* Stated differently, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached. *Id.* Still, matters of

contract construction and interpretation including questions regarding ambiguity are questions of law to be decided by the Court. *Hulda Schoening Family Trust v. Powertel/Kentucky Inc.,* 275 F.Supp.2d 793, 794 (W.D. Ky. 2003) (citing *Frear v. P.T.A. Industries*, 103 S.W.3d 99, 105 (Ky. 2003)). With this standard in mind, the Court provides the following background.

## II. Background

### A. Parties' Relationship and Dealer Agreement

Imagetec is an Illinois limited partnership headquartered in McHenry, Illinois. [R. 1, Compl., at ¶ 3] Imagetec is a dealer of digital office equipment that "provides customizable print management and digital office equipment solutions to business customers in northern Illinois and Wisconsin." *Id.* at ¶ 8. Imagetec partners with various manufacturers and distributors of digital office equipment for sale or lease to its customer base, including multi-function copiers, scanners, printers and the like, such as Lexmark. *Id.* at ¶ 10. It also offers its customers managed print services which incorporates data collection software that tracks equipment use, maintenance needs, and supply needs (such as toner), including the model of each device, page counts, toner levels, machine status and the location of each piece of office equipment connected to the customers' network ("Managed Print Services"). *Id.* at ¶ 11. Its customers utilize Managed Print Services and allow Imagetec to remotely monitor their digital office equipment to ensure the equipment works properly, ensure adequate supplies are available as needed, and to keep costs related to such equipment minimal. *Id.* at ¶ 12. Imagetec uses fleet management software installed on its customers' office network systems that collects information from its customers' digital office equipment and transmits that information back to Imagetec. *Id.* ¶ 13. Imagetec's Managed Print Services reduces the costs to both Imagetec and its customers by eliminating the costs associated with having field technicians travel to each customer to collect

page count and machine information. *Id.* at ¶ 14.

Defendant Lexmark is a Delaware corporation headquartered in Lexington, Kentucky. *Id.* at ¶ 4. Defendant Hoskins is Lexmark's Manager of Channel Services for North America Channel Sales and is a resident and citizen of Kentucky. *Id.* at ¶ 5. Lexmark is a supplier of digital office equipment, supplies, and parts for the upkeep of its equipment, as well as associated services related to the monitoring and maintenance of such equipment at its dealers' customer locations. *Id.* at ¶ 9. Lexmark sells its printers and toner cartridges mainly through non-exclusive reseller agreements with companies and across the United States and globally. [R. 46-1, Defs. Mem. in Supp., at p. 2]

Imagetec and Lexmark's relationship began in 2009. [R. 1, Compl., at ¶ 15] In December, 2009, Imagetec and Lexmark entered into the Lexmark Business Solutions Dealer Agreement (the "Dealer Agreement"). *Id.* at ¶ 16; [R. 1-1, Ex. 1, Dealer Agreement] The Dealer Agreement appointed Imagetec as a "non-exclusive provider" and granted Imagetec a "non-exclusive, non-transferable right to offer select Lexmark Products, Supplies and/or Parts directly to end user customers within its assigned territory." *Id.* The agreement also permitted Imagetec to become an authorized provider of Lexmark's products, which it could not be unless it sold the products as well. *Id.* at § 5.

The Dealer Agreement permitted Imagetec or Lexmark to terminate the agreement with or without cause upon thirty (30) days' notice. *Id.* at § 7. This agreement contained a choice of law provision stating the agreement was governed by Kentucky law, as well as an arbitration provision (the "Arbitration Provision"), which reads as follows:

**10. GENERAL**

Both parties agree that any Disputes will be decided under Kentucky law, excluding its conflict of law provisions, and through arbitration by a sole

arbitrator pursuant to the Commercial Arbitration Rules of the American Arbitration Association then in effect. In undertaking the arbitration, the parties agree that (a) the direct costs of the arbitration shall be shared equally by the parties (with the expenses of each party to be self- funded including filing fees); (b) they shall be limited to taking no more than three (3) depositions each and that no interrogatories shall be permitted; (c) that the arbitration shall be completed within six (6) months from the date the arbitrator is selected (unless any delays arise that are beyond the control of the parties); (d) that the arbitration shall be governed by the United States Arbitration Act; (e) the venue of the arbitration shall be in Fayette County, Kentucky and Dealer hereby consents to personal jurisdiction in Fayette County and (f) that the resulting arbitration award will be binding upon the parties and may be entered by any court of competent jurisdiction. Any monetary awards shall be limited in accordance with the provisions of this Agreement and, as such, (a) the Arbitrator is specifically prohibited from awarding any punitive damages or other damages excluded by this Agreement, and (b) each party irrevocably waives any right to recover damages outside the scope of these limitations. This arbitration provision shall not prohibit Lexmark from seeking injunctive relief as further described in this Agreement.

This Agreement will not be supplemented or modified by any course of dealing or trade usage. Variance from or addition to the terms and conditions of this Agreement in any purchase order or other written notification from Dealer will be of no effect.

The provisions of this Agreement which by their nature extend beyond the termination or expiration of this Agreement will survive and remain in effect until all obligations are satisfied.

[R. 1-1, Ex. 1, Dealer Agreement, § 10]  The Dealer Agreement defined "disputes" as "any and all claims, actions, and suits arising out of or in any way relating to this Agreement  regardless of whether the claim alleges or is based upon tortious conduct . . . or any other legal theory, including, but not limited to, any matter arising out of or related to the breach or termination of this Agreement." *Id.* at § 6.

## B. The LFM Agreement

Imagetec acknowledges that "[i]nitially the relationship between the [the Parties] was mutually beneficial." [R. 1, Compl., at ¶ 19]  In fact, "revenues stemming from its relationship with Lexmark constituted more than 20% of Imagetec's overall revenue. . . ." *Id.*  Imagetec

"regularly relied on Lexmark's expertise and judgment in Imagetec's business," which Imagetec credits as "instrumental" to its sales efforts. *Id.* at ¶ 20. Imagetec even relied on Lexmark to interface with its customers for demonstrations of specific equipment and referring various products. *Id.* Further, Imagetec relied on high level executives at Lexmark "for their judgment and input into what equipment Imagetec would purchase, including . . . upcoming new products." *Id.* ¶ 22.

As a result of this strong relationship, Lexmark approached Imagetec in May 2012 and suggested that it abandon its fleet management software in favor of Lexmark's Fleet Manager Software (the "LFM Software") on both Imagetec's own and Imagetec's customers' business network systems under Lexmark's Fleet Manager 2.0 Program Agreement, dated November 30, 2012 ("LFM Agreement"). *Id.* at ¶¶ 1, 26. Lexmark made several representations concerning the LFM Software to Imagetec, including a live demonstration on May 22, 2012 at Imagetec's offices to show the functionality and features of the LFM Software. *See id.* at ¶¶ 27, 28, 29, 34. However, during this live presentation, various functions of the LFM Software did not function properly. *Id.* at ¶ 34. Notwithstanding the failed live demonstration, Imagetec still entered into the LFM Agreement with Lexmark in late November 2012. *Id.* at ¶ 39.

The LFM Agreement is a license agreement that allows Imagetec to utilize the LFM Software in place of Imagetec's, allowing Imagetec and Lexmark's other dealers and service providers to monitor its respective customers' printers and supply needs. [R. 1-3, Ex. 5, p. 2] The LFM Agreement contained no arbitration provision, but did contain an integration provision (the "Integration Provision"), which reads in full:

> **7.5.4** This Agreement comprises the full and final understanding between Lexmark and Solution Provider, and merges and supersedes any and all other agreements except as expressly set forth herein, and any and all other understandings or representations, written or oral, with respect to the subject matter hereof. It may

not be modified except by a writing signed by authorized representations of both Lexmark and Solution Provider, and referring specifically to this Agreement. Any attempt by Solution Provider to assign this Agreement shall be void.

[R. 1-5, Ex. 5, LFM Agreement, at Page ID#: 76] The LFM Agreement also contains a choice of law provision that selects Kentucky law to govern the agreement. *Id.* at § 7.5.3; Page ID#: 76. However, the LFM Agreement is silent as to how the Parties are to resolve any disputes arising from that agreement. Accepting Plaintiff's well-pleaded factual allegations as true, Imagetec entered into this agreement because of the strong relationship that had formed with Lexmark since the execution of the Dealer Agreement. [R. 1, Compl., at ¶¶ 15, 19-24, 26-29, 34] Imagetec reincorporates for reference its allegations regarding this strong relationship and its reliance upon Lexmark before each Count in its Complaint. *See id.* at ¶¶ 100, 110, 121, 137, 145.

## C. Disputes and Subsequent Transfer

The LFM Software failed from the start in a variety of ways. [R. 1, Compl., at ¶¶ 44-96] Imagetec made Lexmark aware of these problems and Lexmark endeavored to remedy them, all to no avail. *See id.* By May 2015, the problems with the LFM Software were continuing to have such a negative impact on its operations and its customer relationships that "it became clear to Imagetec that . . . it was necessary to replace [the LFM Software]." *Id.* at ¶ 95. Ultimately, Imagetec engaged another company to replace the LFM Software, "which led to additional expenses and work for Imagetec." *Id.* at ¶ 96. Lexmark alleges that when Imagetec transitioned to another software provider, Imagetec terminated the LFM Agreement. [R. 46-1, Defs. Mem. in Supp., at p. 5] Imagetec does not state anywhere in its pleadings that it terminated the LFM Agreement. At this stage, because the Court will accept all factual assertions as true and construe them in favor of the non-moving party, the Court cannot make the legal finding that

Defendants request. *Reeves*, 530 U.S. at 150–51. Imagetec alleges that its actions were followed by Lexmark's "Wrongful Retaliatory Termination of the Dealer Agreement." [R. 1, Compl., at Heading, ¶¶ 96-97] While the Court need not accept legal conclusions couched as factual assertions as true, it notes from Plaintiff's own assertions that these two events were clearly related.

On June 22, 2016, Lexmark terminated the Dealer Agreement. [R. 1, Compl., at ¶ 99; R.1-6, Ex. 6, Termination Letter] In doing so, Imagetec was no longer able to sell and support Lexmark products, including the LFM Software *Id.*; R. 1-1, Ex. 1, Dealer Agreement, at § 16, Page ID#: 45] Imagetec alleges that "Lexmark's unjustified and *retaliatory* termination of the Dealer Agreement and Imagetec's loss of business as an authorized dealer and servicer of Lexmark equipment caused significant damage to Imagetec . . . ." [R. 1, Compl., at ¶ 98] (emphasis added). Imagetec also alleges that Lexmark's termination of the Dealer Agreement caused "significant damage to Imagetec's reputation, customer relationships and business by preventing Imagetec from continuing to sell and service Lexmark products, services and parts to its existing and potential customers . . . ." *Id.* at ¶ 99.

Imagetec filed suit in the Northern District of Illinois on February 3, 2017 alleging breaches of contract and other statutory violations. [R. 1, Compl.] Counts I-III of the Complaint stem from Lexmark's conduct concerning the LFM Agreement, while Counts IV-V stem from both Defendants' conduct concerning the Dealer Agreement. In Count I, Imagetec alleges a breach of the LFM Agreement against Lexmark. [R. 1, Compl., at ¶¶ 100-109] In Count II, Imagetec alleges fraudulent inducement of the LFM Agreement. [R. 1, Compl., at ¶¶ 110-120] In Count III, Imagetec alleges a violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILSC 505/1 *et seq.* [R. 1, Compl., at ¶¶ 121-136] In Count IV, Imagetec

alleges a violation of the Illinois Franchise Disclosure Act, 815 ILCS 705/1 *et seq.* concerning

the Dealer Agreement against both Lexmark and Hoskins. [R. 1, Compl., at ¶¶ 137-144] Finally,

in Count V, Imagetec alleges a violation of the Wisconsin Fair Dealership Law, Wis. Stat.

135.01, *et seq.* against Lexmark. [R. 1, Compl., at ¶¶ 145-151]

Defendants first moved to dismiss this action in March, 2017 and also moved to transfer

venue. *See* [R. 15; R. 16] The case was transferred to the Eastern District of Kentucky from the

Northern District of Illinois in December pursuant to 28 U.S.C. § 1406(a), without the court first

ruling on the pending motions to dismiss. [R. 25; R. 26; R. 27] Thereafter, Defendants refiled

the instant Motion to Compel Arbitration pursuant to the FAA and to Dismiss Plaintiff's

Complaint pursuant to Rule 12. [R. 46] Accordingly, the Court will apply the law of the

transferee Court (Kentucky) where applicable to this dispute. *See K-Tex, LLC v. Cintas Corp.*,

693 F. App'x 406, 409 (6th Cir. 2017).

### III.    Legal Framework

### A.  FAA Overview

The Federal Arbitration Act ("FAA") was enacted "to ensure judicial enforcement of

privately made agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219

(1985). The statute "embodies [a] national policy favoring arbitration . . . ." *Richmond Health

Facilities v. Nichols*, 811 F.3d 192, 195 (6th. Cir. 2016) (citing *Seawright v. Am. Gen. Fin.

Servs., Inc.,* 507 F.3d 967, 972 (6th Cir. 2007)). The FAA applies to written agreements to

arbitrate disputes that arise out of contracts involving transactions in interstate commerce.[1]

---

[1] The Federal Arbitration Act ("FAA") applies only to "[a] written provision in any maritime transaction or *a contract evidencing a transaction involving commerce.*" 9 U.S.C. § 2 (emphasis added). In *Allied Bruce–Terminix Companies, Inc. v. Dobson,* the United States Supreme Court had occasion to interpret the phrase "evidencing a transaction involving commerce." 513 U.S. 265 (1995). First, the Court concluded that the word "involving" was the "functional equivalent of 'affecting.'" *Id.* at 273–74. Next, the Court adopted a "transaction in fact" interpretation of the phrase "evidencing a transaction." *Id.* at 277-78. The Court read[] the Act's language as insisting that the 'transaction' in

There is no dispute here that the Parties' disputes arise out of agreements involving or "affecting" transactions in interstate commerce. Under the FAA, such agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that a district court *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Byrd*, 470 U.S. at 218 (emphasis in original).

### B. Interplay Between FAA and State Contract Law

Arbitration agreements are fundamentally contracts. As such, courts must "review the enforceability of an arbitration agreement according to the applicable state law of contract formation." *Seawright*, 507 F .3d at 972; *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009) ("[S]tate law," therefore, is applicable to determine which contracts are binding under § 2 and enforceable under § 3 "if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.") (quoting *Perry v. Thomas*, 482 U.S. 483, 493, n. 9 (1987)); *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003).

Under § 4, when a party is "aggrieved  by the failure of another party to arbitrate under a written agreement for arbitration," that party "may petition a federal court for an order directing that such arbitration proceed in the manner  provided for" by the contract. *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010) (quoting 9 U.S.C. § 4) (internal quotation marks omitted). According to the Supreme Court, the FAA "places arbitration agreements on an equal footing with other contracts, and requires courts to enforce them according to their terms." *Id*. at 67

---

fact 'involv[e]' interstate commerce, even if the parties did not contemplate an interstate commerce connection." *Id.* at 281.

(internal citations omitted); *see also AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 339 (2011).

## C. Court's Two-Step Process

When a party invokes the FAA and asks a federal court to dismiss or stay a case and compel arbitration, the Court must determine whether the parties agreed to arbitrate the dispute at issue. *Stout*, 228 F.3d at 714. When deciding whether parties agreed to arbitrate a specific matter, "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *Dixon v. Daymar Colleges Grp., LLC*, 483 S.W.3d 332, 342 (Ky. 2015) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)); *Ping v. Beverly Enterprises, Inc.,* 376 S.W.3d 581, 590 (Ky. 2012) (". . . a party seeking to compel arbitration has the initial burden of establishing the existence of a valid agreement to arbitrate. Unless the parties clearly and unmistakably manifest a contrary intent, that initial showing is addressed to the court, not the arbitrator, and the existence of the agreement depends on state law rules of contract formation.") (citations omitted); *see also N. Fork Collieries, LLC v. Hall,* 322 S.W.3d 98, 102 (Ky. 2010) ("[The trial court's] task generally is simply to decide under ordinary contract law whether the asserted arbitration agreement actually exists between the parties and, if so, whether it applies to the claim raised in the complaint.").

This requires an examination of the contract language in light of the strong federal policy favoring arbitration, resolving any ambiguities in the contract or doubts as to the parties' intentions in favor of arbitration. *Stout*, 228 F.3d at 714; *see also Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 503 (6th Cir. 2007). Courts should engage in the following inquiry prior to compelling an unwilling party to arbitration: 1) Determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties – a question of law

governed by state contract law; and 2) Determine whether the specific dispute falls within the substantive scope of that agreement—a question of law governed by federal substantive law. *Javitch*, 315 F.3d at 624 (citing *AT & T Techs. v. Communications Workers of Am.*, 475 U.S. 643, 649 (1986)) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.") (other citations omitted).

Finally, the FAA carefully limits the role of the Court in considering a motion to compel arbitration. *See Int'l Bhd. of Elec. Workers, Local 71 v. Traffitech, Inc.*, 461 F.3d 690, 693 (6th Cir. 2006) (limiting courts' role to deciding if party seeking arbitration is making a claim which on its face is governed by the contract) (other citations omitted); *Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC*, 967 F. Supp.2d 756, 763 (S.D. N.Y. 2013) (citing *Dry Harbor HRF Inc. v. Local 1199, Drug, Hosp. and Health Care Employees Union, RWDSU/AFL–CIO*, No. 87 Civ 3444, 1988 WL 8615 at *3 (E.D. N.Y. Jan. 15, 1988)) ("Prior to arbitration, a court's role is severely circumscribed; it can only undertake two inquiries: whether or not the company was bound to arbitrate and what issues must it arbitrate.").

### IV.    Discussion

In their Motion, Defendants argue for dismissal of all claims in Imagetec's Complaint on several independent grounds.  Their primary contention is that the Parties agreed to arbitrate all of Imagetec's disputes at issue in this case under the Arbitration Provision contained in the Dealer Agreement.  Separately, Defendants argue for dismissal of some of the individual Counts for failure to state a claim.  For example, Defendants argue Count IV must be dismissed because Imagetec was not Lexmark's franchisee. [R. 46-1, Defs. Mem. in Supp., at p. 1]  In addition,

Defendants allege that Counts III and V must be dismissed because the Parties agreed to apply Kentucky law to both the Dealer Agreement and the LFM Agreement, and neither of these claims are available under Kentucky law. *Id.* As previously mentioned however, the Court's role in deciding the present Motion is limited to deciding whether the Parties agreed to arbitrate, and which claims or issues must be arbitrated. *HLI Rail & Rigging, LLC*, 967 F.Supp.2d at 763. Accordingly, the Court declines to reach Defendants' alternative arguments for dismissal on these Counts.

In response, Imagetec does not contest that Counts IV-V (those claims stemming from the Dealer Agreement) are subject to arbitration. [R. 47, Pl. Resp., at p. 23] However, Imagetec does resist dismissal of these Counts on Defendants' alternative bases. *See id.* Imagetec also disputes that Counts I-III (the claims stemming from the LFM Agreement) are subject to arbitration. *Id.* at pp. 1, 5-14. Imagetec argues that its LFM Software Claims in Counts I-III of the Complaint are not subject to arbitration for two main reasons. First, Imagetec argues that the LFM Agreement and the Dealer Agreement cannot be construed as a single agreement. *Id.* at pp. 5-10. This is so because the LFM Agreement contains an Integration Clause, which Imagetec argues supersedes the prior Dealer Agreement, and the LFM Agreement contains no arbitration clause governing disputes arising between the Parties from the LFM Agreement. *See id.* Imagetec's second primary argument in opposition is that the claims in Counts I-III of the Complaint fall outside the scope of the Arbitration Provision in the Dealer Agreement. *Id.* at pp. 11-14. Distilled, Imagetec asks this Court to find that the Parties did not agree to arbitrate the claims alleged in Counts I-III of the Complaint, but even if they did, to find that the claims in Counts I-III fall outside the scope of the Arbitration Provision from the Dealer Agreement.

The Court will address the first series of arguments since they touch on "whether the parties agreed to arbitrate" the claims alleged in Counts I-III, before addressing whether these claims fall within the scope of the Arbitration Provision of the Dealer Agreement.

### A. Arbitrability of Counts IV-V

Lexmark argues that Counts IV-V include claims that arise from the Dealer Agreement, and as such are subject to the Arbitration Provision of that agreement. *See* [R. 46-1, Defs. Mem. in Supp., at pp. 2, 6-8] Imagetec apparently does not contest the validity of the Parties' Arbitration Provision, or that the claims contained within Counts IV-V (concerning the Dealer Agreement) fall within the scope this Arbitration Provision. *See* [R. 47, Pl. Resp., at pp. 1, 23] It makes a passing argument that Defendants have waived their right to arbitrate these claims by seeking dismissal, *see id.* at p. 17, but the Court finds this underdeveloped argument unconvincing, given that the Defendants seek to compel arbitration and dismiss the claims based on their argument that all of Plaintiff's claims are subject to arbitration, as well as their alternative arguments for dismissal of Counts III, IV, and V. *See* [R. 46-1, Defs. Mem. in Supp., at p. 3] Therefore, the Court is satisfied that the agreement to arbitrate these claims is not "in issue," and will therefore compel arbitration of Imagetec's Counts IV-V. *Great Earth Cos.*, 288 F.3d at 889.

### B. Arbitrability of Counts I-III

#### i. Kentucky State Law of Contract Formation Applies

As a preliminary matter, the Court notes that Kentucky law applies to the first of its two-step inquiry. The case was transferred to the Eastern District of Kentucky from the Northern District of Illinois in December, 2017 pursuant to 28 U.S.C. § 1406(a) without the court first ruling on the pending motions to dismiss. [R. 25; R. 26; R. 27] Thus, the law of the transferee

court applies to this dispute. *See K-Tex, LLC v. Cintas Corp.*, 693 F. App'x 406, 409 (6th Cir. 2017) (explaining the distinction between a transfer under § 1404(a) and § 1406(a) "is important because if a case is transferred via . . . § 1406 . . . the law of the transferee court applies.") (citing *Martin v. Stokes*, 623 F.2d 469, 472 (6th Cir. 1980)) ("[F]ollowing a transfer under § 1406(a), the transferee district court should apply its own state law rather than the state law of the transferor district court."). Therefore, the Court will apply Kentucky contract law when reviewing the enforceability of the Parties' Arbitration Provision according to the Kentucky law of contract formation. *Seawright*, 507 F .3d at 972.

> **ii.   Whether the Parties Agreed to Arbitrate Disputes from the LFM Agreement.**

Imagetec disputes that the Parties agreed to arbitrate the claims in Counts I-III of the Complaint for several reasons. For support, Imagetec argues 1) the LFM's Integration Provision proves that the parties did not intend to arbitrate; 2) the LFM Agreement and the Dealer Agreement cannot be construed as a single agreement; and 3) Lexmark supplied unsupported arguments and facts in their Motion regarding the two agreements' relationship that provide no basis to subject Counts I-III to arbitration. Because the first two arguments touch on the same issue, the Court will address them together. Lexmark does not address Imagetec's third argument at all in its Reply, so the Court construes this as a waiver of any opposition to this issue. Moreover, as will be explained in Part IV.B.iii, *infra*, because Imagetec is the Party that has placed the closeness of the Parties' relationship squarely at issue in the pleadings, this becomes a moot issue here.

> **a.   Effect of the Integration Provision**

Imagetec first argues that because the LFM Agreement contains an Integration Provision and contains no Arbitration Provision, the Parties' intent was that the LFM Agreement is not

subject to any other agreements. [R. 47, Pl. Resp., at p. 6] (citing [R. 1-5, Ex. 5, LFM Agreement, at Page ID#: 76]).  For support, Imagetec supplies Kentucky caselaw which stands for the general proposition that the existence of an integration provision in a contract "represents that the agreement is complete and there are no other agreements related to the subject matter." *Id.* (citing *KFC Corp. v. Darsam Corp.*, 543 F. Supp. 222, 225 (W.D. Ky. 1982)); *Sergent v. McKinstry,* 472 B.R. 387, 419 (E.D. Ky. 2012).

In response, Lexmark attempts to distinguish the holding in *Sergent*, arguing that in that case, the court found that an integration clause supersedes all prior agreements to the extent that the prior agreements are inconsistent with the integrated agreement on the same subject matter." [R. 48, Def. Reply, at pp. 2-3] (citing *Sergeant*, 472 B.R. at 419).  Lexmark argues that the LFM Agreement is not inconsistent with the Dealer Agreement since the LFM Agreement is silent on the issue of arbitration "because the Dealer Agreement—the lynchpin of the relationship—deals with dispute resolution." *Id.* at p. 3.   After an exhaustive search, the Court has identified no Kentucky case directly on point, that is, addressing whether the enforcement of a broad arbitration agreement contained in an earlier contract between the parties is automatically precluded due to the operation of an integration clause in a second, subsequent contract between the same parties.[2]  However, that does not mean that there is no guidance on how Kentucky courts would view this issue.

---

[2] The Kentucky Supreme Court has addressed the issue in reverse—when a later agreement contained an arbitration clause and an earlier one contained a merger clause, finding the existence of an earlier drafted merger clause did "not prohibit the parties from future agreements to modify or even to rescind the contract." *Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 834 (Ky. 2013).  This is so because  "a merger clauses  is a contractual provision to the effect that the written terms of the contract may not be varied by *prior* agreements because all such agreements have been merged into the written document." *Id.* (citing 17A C.J.S. Contracts § 577 (2013)) (emphasis in original).

The Restatement (Second) of Contracts, sections 213 and 216 (which the Kentucky Court of Appeals has cited as authority when discussing integration, *see Keith v. Robinson*, No. 2005-CA-001260-MR, 2006 WL 3524056, at *2 (Ky. Ct. App. Dec. 8, 2006)) explains as follows:

> (1) A binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them.
>
> (2) A binding completely integrated agreement discharges prior agreements to the extent that they are within its scope.
>
> (3) An integrated agreement that is not binding or that is voidable and avoided does not discharge a prior agreement. But an integrated agreement, even though not binding, may be effective to render inoperative a term which would have been part of the agreement if it had not been integrated.

Restatement (Second) of Contracts § 213 (1981).

> (1) Evidence of a consistent additional term is admissible to supplement an integrated agreement unless the court finds that the agreement was completely integrated.
>
> (2) An agreement is not completely integrated if the writing omits a consistent additional agreed term which is
>
>   (a) agreed to for separate consideration, or
>   (b) such a term as in the circumstances might naturally be omitted from the writing.

Restatement (Second) of Contracts § 216 (1981).

These sections make clear that if an agreement is **partially** integrated, then evidence of additional consistent terms may come in, but if it is **completely** integrated, then evidence of additional consistent terms is not allowed. Unfortunately, the parties did not address this distinction in their briefing. Thus, their arguments on the meaning and effect of the Integration Provision, including arguments regarding the *Sergent* case, are of limited assistance. Nevertheless, the authority which the Court located indicates that the Integration Provision should be read to effect a complete integration of the LFM Agreement.

The Kentucky Supreme Court stated last year that "[a]s a matter of law, a document which on its face appears to be a complete integration is a complete integration." *Vanhook Enterprises, Inc. v. Kay & Kay Contracting, LLC*, 543 S.W.3d 569, 572–73 (Ky. 2018). In *Vanhook*, the court applied that rule to find that a merger clause stating that the parties intended a contract to "represent[ ] the entire and integrated agreement between the Contractor and Subcontractor and supercedes [sic] all prior negotiations, representations, or agreements, either written or oral . . ." meant that the contract was fully integrated. Similarly, some years ago the Western District of Kentucky examined an integration clause which read:

> This agreement supersedes any and all other oral or written agreements between the parties hereto with respect to the outlet which is the subject matter hereof and contains all the covenants and agreements between the said parties with respect to said matter. Franchisee acknowledges that neither KFC nor anyone on behalf of KFC has made any representations, inducements, promises or agreements, orally or otherwise, respecting the subject matter of this agreement or respecting any other subject matter, which are not embodied herein.

*Darsam*, 543 F. Supp. at 224. The court explained that "[s]uch a clause makes clear the intention of both parties that the agreement was to be the complete and exclusive statement of terms. . . . [and] may be taken at its face value . . . and is sufficient to prevent the consideration of prior representations." *Id.* at 225 (internal citations and quotation marks omitted). The court concluded by stating that it was "confident that the Kentucky courts would take a similar approach and find such a merger or integration clause sufficient basis to consider the agreement the complete and accurate integration of the contract and therefore refuse to admit evidence for the purpose of varying or contradicting the writing." *Id.*

In light of these authorities, the Court finds that the similar language of the Integration Provision in this case (in relevant part, that the LFM Agreement "compromises the full and final understanding between Lexmark and Solution Provider, and merges and supersedes any and all

other agreements except as expressly set forth herein, and any and all other understandings or representations, written or oral, with respect to the subject matter hereof") on its face appears to be a complete integration, and thus under Kentucky law is a complete integration. For that reason, it does not matter whether the arbitration provision in the Dealer Agreement is consistent or not—either way, it cannot be part of the fully integrated LFM Agreement.

However, that is not the end of the inquiry. Comment c to section 213 of the Restatement explains:

> c. Scope of a completely integrated agreement. Where the parties have adopted a writing as a complete and exclusive statement of the terms of the agreement, even consistent additional terms are superseded. See § 216. But **there may still be a separate agreement between the same parties which is not affected**. To apply the rule of Subsection (2) the court in addition to determining that there is an integrated agreement and that it is completely integrated, must determine that the asserted prior agreement is within the scope of the integrated agreement. Those determinations are made in accordance with all relevant evidence, and require interpretation both of the integrated agreement and of the prior agreement.

Restatement (Second) of Contracts, § 213 cmt. c (1981) (emphasis added). Hence, the next step is to examine "all relevant evidence" and determine whether the Arbitration Provision in the Dealer Agreement falls outside the scope of the LFM Agreement, and is thus unaffected by the Integration Provision.

The Court concludes that it does. While the parties failed to identify this issue as such and thus did not present evidence as to whether the Dealer Agreement falls within the scope of the LFM Agreement, an examination of the contract leads to the conclusion that it does not. First, there is the very fact of the existence of the LFM Agreement—if the parties felt that the software covered by the LFM Agreement was already covered by the Dealer Agreement, there would be no reason to enter into the separate LFM Agreement. Second, the text of the two agreements demonstrates that the Dealer Agreement does not fall within the scope of the LFM

Agreement. The LFM Agreement Recitals provide: "LFM 2.0 is a program . . . established by Lexmark to enable certain solution providers . . . to expand the services offerings that they may provide to their customers by utilizing certain software tools, training, and support provided by Lexmark . . . Solution Provider [defined as including Imagetec] is desirous of becoming a Program Solution Provider and participating in the Program . . . [and] Lexmark is willing to accept Solution Provider into the Program . . . ." [R. 1-5, Ex. 5, LFM Agreement, at Page ID# 67] The LFM Agreement provides terms for this contractual relationship involving certain software (referred to as "Licensed Software"). *Id.* On the other hand, the first page of the Dealer Agreement states that it "identif[ies] the respective responsibilities of Lexmark and Dealer [Imagetec] as it relates to the program defined herein in terms of discounts off select Lexmark Products, Supplies, or Parts purchased by Dealer from authorized Lexmark distributors or rebate programs offered by Lexmark directly to Dealer." [R. 1-1, Ex. 1, Dealer Agreement, p. 1] The only mention of software in the Dealer Agreement is a provision stating that Lexmark may authorize Dealer to download software for certain Lexmark printers from its website, and providing that these software applications are copyrighted material of Lexmark (or its licensors), that Dealer will only use such software on Lexmark printers, and that it will be bound by the terms and conditions accompanying such software. *Id.* at § 9. Likewise, apart from a provision requiring Imagetec to ensure that only genuine Lexmark "consumables and Lexmark replacement parts . . . are being used on Lexmark-branded devices being monitored or supported by the Licensed Software," the LFM Agreement does not mention Lexmark Products, Supplies, or Parts except in passing. *See* [R. 1-5, Ex. 5, LFM Agreement, at Page ID# 71]

Further supporting the Court's conclusion is that other jurisdictions have addressed this issue in the context of arbitration provisions specifically, and reached similar conclusions under

much the same logic. While these cases are not binding on this Court, they are instructive for resolving the current issue. *See, e.g.*, *Primex Int'l Corp. v. Wal-Mart Stores, Inc.*, 89 N.Y.2d 594, 601–02, 679 N.E.2d 624 (1997) (finding that claims arising out of a third agreement that did not contain an arbitration clause and did contain a merger clause could not be sent to arbitration, but claims arising under parties' first two agreements, which did include arbitration clause, could be sent to arbitration despite the existence of the third agreement's merger clause since the general rule of contract interpretation of New York and federal common law is that arbitration provisions survive termination of the contract); *Sanchez v. Gen. Elec. Co.*, 196 F. Supp. 3d 726, 730–31 (S.D. Tex. 2016) (applying New York law and finding that "a merger clause is insufficient to preempt a prior arbitration agreement . . . [because] The Second Circuit, applying New York law, held that a merger clause addresses only the use of parol evidence to alter the terms of an agreement and does not affect the enforcement of a separate arbitration agreement") (citing *Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d 278, 283 (2d Cir. 2005) (*abrogated on other grounds by Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287 (2010)). These cases, mostly illustrating New York principles of contract formation, demonstrate that the existence of a merger clause in a subsequent agreement does not prevent enforcement of an arbitration clause in an earlier agreement *so long as* the dispute arises from the earlier agreement. Thus, while Kentucky precedent does not address the exact scenario at issue, the Court concludes that the existence of the Integration Provision in the LFM Agreement will not prevent enforcement of the Parties' earlier Arbitration Provision. In other words, the earlier Arbitration Provision remains separately enforceable[3] with regard to all disputes which properly come

---

[3] The fact that the Dealer Agreement was terminated does not affect the enforcement of the Arbitration Provision. The law in this Circuit is settled that the Court must give post-termination effect to a valid Arbitration Agreement. *See Huffman v. Hilltop Companies, LLC*, 747 F.3d 391 (6th Cir. 2014) (explaining that "the need for an arbitration provision to have post-expiration effect is intuitive, because if 'the duty to arbitrate automatically terminated upon

within its scope, notwithstanding the Integration Provision. What remains is to determine the scope of disputes to which this broad Arbitration Provision applies - the second part of the analysis.

### iii. The Scope of the Parties' Arbitration Provision

In determining the scope of the Arbitration Provision, the Court's analysis is guided by *federal* substantive law, and ambiguities in the contract or doubts as to the Parties' intentions are resolved in favor of arbitration. *Javitch*, 315 F.3d at 624; *Stout*, 228 F.3d at 714.; *see also Nestle Waters*, 505 F.3d at 503.

To determine whether an issue falls within the scope of the Parties' Arbitration Provision, the Sixth Circuit has instructed courts to ask whether "[the] action could be maintained without reference to the contract or relationship at issue," looking to what the action "by necessity must describe." *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 395 (6th Cir. 2003). However, "[i]n the context of multiple contracts, [the Sixth Circuit] has adopted a more narrow test of arbitrability, examining which agreement 'determines the scope of' the contested obligations." *Nestle Waters*, 505 F.3d at 503–04 (citation omitted). "[While this] question of whether and when an arbitration clause in one contract encompasses a dispute arising out of a related [contract] is less common . . . . the following standard emerges for determining which of [Imagetec's] claims must be resolved in arbitration: while [the Court] must bear in mind the presumption of arbitrability, the cornerstone of [its] inquiry rests upon whether [it] can resolve the instant case without reference to the agreement containing the arbitration clause" or the relationship at issue. *NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 814 (6th Cir. 2008) (citing *Nestle Waters,* 505 F.3d at 505)).

---

expiration of the contract, a party could avoid his contractual duty to arbitrate by simply waiting until the day after the contract expired to bring an action regarding a dispute that arose while the contract was in effect'") (quoting *Zucker v. After Six, Inc.*, 174 Fed.App'x. 944, 947–48 (6th Cir. 2006)).

Finally, "if such a reference is not necessary to the resolution of a particular claim, then compelled arbitration is inappropriate, unless the intent of the parties indicates otherwise." *Id.*

### a. *Nestle Waters*

Here, the Court finds that under all three tests (*Nestle*, *Fazio*, and the general "intent" test) the claims from Counts I-III do not fall within the scope of the Arbitration Provision of the Dealer Agreement. First, the Court must look to the contract that determines the scope of the contested obligations. *Nestle Waters*, 505 F.3d at 503–04. The Sixth Circuit addressed this issue last year in *Matalka v. Home Point Fin. Corp.*, 753 F. App'x 372, 375 (6th Cir. 2018). *Matalka* involved a plaintiff and defendant who entered into simultaneous, but separate, contracts—a "Branch Manager" contract, which contained an arbitration provision, and an oral "Regional Manager" contract, which did not. *Matalka*, 753 F. App'x at 374. The "complaint allege[d] that Defendant (1) fraudulently induced his assent to the Regional Manager contract by intentionally or recklessly misrepresenting material facts about the compensation he would receive as a Regional Manager, (2) breached the Regional Manager contract by failing to compensate him pursuant to its terms, and (3) unjustly retained the benefits of the services he rendered in his Regional Manager capacity by failing to compensate him." *Id.* The Sixth Circuit found that under the *Nestle Waters* test, the Regional Manager contract determined the scope of all contested obligations, because the defendant's obligation to compensate the plaintiff for work as regional manager was located in the Regional Manager contract, not the Branch Manager contract, and the Branch Manager contract never referred or even alluded to the position of regional manager. *Id.* at 375.

The same analysis applies here. Counts I and II of the complaint here are breach of the LFM Agreement and fraudulent inducement to enter into the LFM Agreement, while Count III is

violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act. In all three counts, the Plaintiff's basic theory revolves around the LFM Agreement and the LFM Software. The LFM Agreement contains all the obligations pertaining to the LFM Agreement and the LFM Software (as emphasized by the Integration Provision, discussed above). And the Dealer Agreement does not mention any obligations pertaining to either the LFM Agreement or the LFM Software. Thus, under the *Nestle Waters* test, these claims do not fall within the scope of the agreement to arbitrate.

### b. Fazio

The *Fazio* test yields the same outcome. This test instructs courts to look at the current action (here, Counts I-III) and ask if these claims could be maintained without reference to the other contract (here, the Dealer Agreement) or the relationship at issue. The question is what the action **by necessity** must describe. In *NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 817 (6th Cir. 2008), the Sixth Circuit held that this test was still not met where a complaint may have implicated another agreement by alleging the agreement was the source of certain knowledge, but "a court would not need to examine, construe or interpret" its terms to determine a claim, because the court could determine the relevant element of the claim "by referencing some other source of knowledge" than the other agreement. Similarly, *Matalka* found this test was not met where allegations concerning a contract might have been relevant to calculation of damages, but were not something that "by necessity must be described." *Matalka*, 753 F. App'x at 377 (citing *Fazio*, 340 F.3d at 395).

Here, while Imagetec's complaint does mention both the Dealer Agreement and the Parties' relationship in several places in such a way as to potentially bear upon the three claims

at issue here, none of those claims *necessarily* rely on any reference to either. Rather, the Plaintiff is able to show the elements of each claim without such references.

*Count I*

Under Kentucky law, "[t]o prove a breach of contract, the complainant must establish three things: (1) existence of a contract; (2) breach of that contract; and (3) damages flowing from that breach." *Jordan v. Hibbeln*, No. 2016-CA-000406-MR, 2018 WL 3090442, at *5 (Ky. Ct. App. June 22, 2018). Clearly, the plaintiff need not reference the Dealer Agreement or the Parties' wider relationship to prove breach of the LFM Agreement. For instance, the plaintiff could point to the LFM Agreement (which is already in the record); call witnesses to testify that Lexmark did not "use reasonable efforts to correct all material errors or defects" in the software (and thus did not provide Maintenance Services under section 4.2 of the LFM Agreement); and call witnesses or produce documentation of costs resulting from the material errors or defects in the software. Thus, Count I can be maintained without reference to either the Dealer Agreement or any prior relationship of the Parties.

*Count II*

In Kentucky, to prove "harm resulting from fraud in the inducement [a party] must establish six elements of fraud by clear and convincing evidence as follows: a) material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury." *Halle v. Banner Indus. of N.E., Inc.*, 453 S.W.3d 179, 188 (Ky. Ct. App. 2014) (citing *Bear, Inc. v. Smith*, 303 S.W.3d 137, 142 (Ky. App. 2010)). Here too, the plaintiff need not reference the Dealer Agreement or the Parties' relationship in order to prove the elements of the claim. For instance, the plaintiff could produce evidence that Lexmark represented to plaintiff the capabilities of the

- 25 -

Software and its ability to correct material errors or defects in the Software; that this representation was material; that it was false; that it was known to be false or made recklessly; that it was made with inducement to be acted upon; that it was acted in reliance thereon; and (as above) that this representation caused injury. Thus, it is evident that Count II can likewise be maintained without referring to the Parties' relationship or the Dealer Agreement.

*Count III*

"To state a claim under the [Illinois Consumer Fraud and Deceptive Business Practices] Act, a plaintiff must show (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) the deception occurred in the course of trade or commerce; and (4) the consumer fraud proximately caused the plaintiff's injury." *Avon Hardware Co. v. Ace Hardware Corp.*, 2013 IL App (1st) 130750, ¶ 23, 998 N.E.2d 1281, 1290. As above, the plaintiff can maintain this claim without reference to the Parties' relationship or the Dealer Agreement. For instance, it could show a deceptive act or practice by the defendant (perhaps by reference to proof of the same knowing or reckless false material representation just discussed); offer proof that Lexmark intended the plaintiff rely on the deception; show that the deception occurred in the course of trade or commerce; and show that it was the proximate cause of plaintiff's injury. Like the other counts, Count III does not fall within the scope of the Arbitration Provision under the *Fazio* test.

### c.  Intent of the Parties

Finally, the Court "find[s] that the parties did not intend to arbitrate disputes concerning the [LFM] Agreement." *Dental Assocs., P.C. v. Am. Dental Partners of Michigan, LLC*, 520 F. App'x 349, 353 (6th Cir. 2013). "Arbitration is strictly a matter of consent . . . and thus is a way

to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *Id.* (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010).

Here, as in *Dental Assocs.*, the LFM Agreement "does not contain a broad arbitration clause." *Id.* Indeed, unlike the second contract at issue in *Dental Assocs.*, the LFM Agreement does not contain any arbitration clause at all. "If the parties intended to arbitrate all disputes arising out of the [LFM] Agreement, they could have easily included the same broad arbitration provision in that agreement." *Id.* (citing *Alticor, Inc. v. National Union Fire Ins. Co.*, 411 F.3d 669, 672 (6th Cir.2005)). And—like the contract at issue in *Dental Assocs.*, and unlike the deed in *Nestle Waters*—"[i]t cannot be said that a[n] [LFM] Agreement is of the type that would not typically contain an arbitration clause." *Id.* at 354.

For these reasons, the Court finds that the claims in Counts I-III are not encompassed within the scope of the term "disputes" that fall within the Parties' Arbitration Provision of the Dealer Agreement.

## V.    Disposition of Counts I - III

Having found that Counts I – III are not subject to arbitration, this Court has discretion, as a matter of control over its docket, to stay the non-arbitrable claims pending completion of arbitration of the claims which are subject to the arbitration agreement. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 21 n.23 (1983); *Milan Exp. Co. v. Applied Underwriters Captive Risk Assur. Co.*, 590 F. App'x 482, 486 (6th Cir. 2014). While as noted, these claims do not *have* to be tied to the Dealer Agreement out of which the arbitrable claims arise or the parties' wider relationship, they can be. There would likely be a great deal of overlap between the arbitration proceedings ordered here and any litigation, potentially leading to a waste of time and resources for all concerned. Thus, the Court finds that a stay of the non-

arbitrable claims will serve both judicial economy and the interests of the parties. This action and the prosecution of Counts I – III will be stayed pending arbitration of the other claims.

Accordingly, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1.      Defendants Lexmark International, Inc.'s and Cassandra Hoskins' Motion to Compel Arbitration on all Counts of Plaintiff Imagetec, L.P.'s Complaint [**R. 46**] is **GRANTED IN PART, as to Counts IV and V ONLY**. It is **DENIED** in all other respects.

2.      Defendants' Motion to Dismiss [**R. 46**] is **GRANTED IN PART, as to Counts IV and V ONLY**. It is **DENIED** in all other respects.

3.      Plaintiff Imagetec, L.P. **SHALL** prosecute its claims under Counts IV and V in accordance with the Parties' Arbitration Provision.

4.      This matter is **STAYED pending arbitration of Counts IV and V.**

This the 27th day of September, 2019.



CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY